20451.   WESTERN AND ATLANTIC RAILROAD *v.* MICHAEL.

604

Decided January 16, 1931. Adhered to on rehearing, February 26, 1931. Rehearing denied February 28, 1931.

*Tye, Thomson & Tye, Walton Whitwell, Mitchell & Mitchell,* for plaintiff in error.

*Harwell, Fairman & Barrett, J. A. McFarland,* contra.

JENKINS, P. J. (After stating the foregoing facts.)

(2-7) It appears to us that the plaintiff's own evidence, emphatic and unequivocal, disproved his own cause of action, the only difficulty encountered by the court being that there was testimony to the effect that previous to the injury the plaintiff had been sent away from the bank, bench, or terrace where he was working loading the skip-board, on some other errand pertaining to his master's business, and that while he was absent for something over an hour on such mission, the position of the cable used in

hoisting the skip-board was changed so as to cause the skip-board when lifted to swing towards the point on the bank where the plaintiff was standing at the time of the injury, and in a direction different from that in which the skip-board had swung before the plaintiff left. The plaintiff contends that the defendant was negligent in not warning him of the peril which had thus arisen during his absence. After giving the case long and careful consideration, we have reached the conclusion that the proximate cause of the injury was not any negligence on the part of the defendant, but that it was brought about by a lack of due care on the part of the servant himself. While the evidence of the plaintiff is somewhat contradictory, nothing is better settled than that the testimony of a party who offers himself as a witness in his own behalf is to be construed most strongly against him, and he is not entitled to a finding in his favor if that version of his testimony the most unfavorable to him shows that the verdict should be against him. With this rule in mind, a verdict in favor of the defendant seems to be absolutely demanded. Just a few quotations from the plaintiff's own testimony will illustrate such a conclusion: "I had been working there on that job three months." "I would not say how long I had been on the skip-board, something like two or three weeks." "Naturally I could have seen which side of the strut the cable was on had I looked. . . I could have determined from which side of the strut the cable was on which way it would swing. . . From setting in the center of the second bench I knew it would swing towards the Atlanta end if the cable was on the Atlanta side of the strut." "The skip-board at the time I was injured was setting somewhere about the center of the bench." "The skip-board was right under the strut. The skip-board had to swing out from under that strut. . . I could see the cable. . . There wasn't anything to prevent me from seeing it. . . I could have determined from which side of the strut the cable was on which way it would swing." "When I fastened the chains to this skip-board, and after it was fastened, it was my duty then to get to where I thought was a safe place and stand there. . . That's all I had to do after I fastened the chains to the skip-board, until after the skip-board was raised up, was to look out for myself and get clear of the skip-board. . . I had been instructed and warned to stay out of the way of the skip-board. I knew that any

way, whether I had been warned or not. That's the first thing to do, get out of the way of the skip-board. . . It was my duty to do that. . . It was up to me to look out and see that I was in a safe place." . . "Mr. Goins [his co-worker] stepped up on the next bench. . . It was a perfectly safe place he was standing, . . completely away so far as its swinging under the strut. . . If it was swinging either way he would have been clear regardless of whether it was swinging towards Chattanooga or Atlanta, and I would have been clear of the board swinging if I had been up there. . . I knew that I could get on that bench and be clear of any swinging of the skip-board. . . I could have gotten on it. . . I could have gotten on that bench and been in a place of safety. . . Mr. Goins did that." "I was nearest the end of the second bench that was nearest the base of the tunnel. . . I could have, when I hooked that chain, merely stepped down on the base and could have walked clear out of the mouth of the tunnel. Had I stepped down that short distance I certainly would have been perfectly clear of any swinging of the skip-board." "They [the operators] watch us and move it [the skip-board] after they see we have fastened the chains, we do not give them any signals to move the board, they watch and see when it is fastened." "The only warning that would be given when they started to move the board, when they got ready they would holler 'heads up,' and that would put everybody on notice that the board was coming up, that was the only warning, that was the general warning given when the board was raised." "I won't say that on this occasion that I did not hear 'heads up.' . . The place where the skip-board was lowered and the dirt being taken out, that place was changing all the time, we were cutting down the bench all the time, and every shovelful of dirt we took out made a change in it. We could not load the skip-board unless it was in loading distance of the bank. As we would dig off the bank towards Chattanooga the skip-board would be moved on towards Chattanooga to where we could load it. . . The skip-board kept on moving towards Chattanooga with the bank. . . The tendency all along there was to move the board on towards Chattanooga. I had been gone out of the tunnel something like an hour." "I fastened the chains and then undertook to get in what I thought was safe position. I thought I had done that, I walked over this board here to that bank, and by the time I turned around the board hit me."

It is true that the plaintiff on redirect examination gave testimony that when the cable was "loose and the skip-board is back under the strut and with the cable lying against the strut you can't tell which side it is on by looking at the cable; . . you can't even if you look at the cable;" but notwithstanding this testimony, he had already sworn positively, unqualifiedly, and repeatedly that he could tell by merely looking at the cable on which side of the strut it was. We do not think that the theory of able counsel for plaintiff that the admission made by the plaintiff can be construed to mean that he could have thus ascertained the position of the cable had he remained present all the time and without interruption is sound; nor do we think that under the evidence of the plaintiff it was the duty of the operators of the machinery to bear in mind which direction the plaintiff had been moving to as a place of safety at the time he was sent off on another errand, and remind him on his return that such a position would be dangerous, in view of the fact that the plaintiff repeatedly admitted that it was his own duty to observe the position of the cable and to look out for his own safety, and that there were two positions which he could have taken which would have insured his safety no matter in which direction the skip-board swung. Especially is this true in view of the fact that the plaintiff knew that the conditions were in process of continuous change, and consequently he had no possible right to rely upon the fact that nothing had been done during his absence of more than an hour. Even if, contrary to his own testimony, he could not see the position of the cable, .the merest prudence would have suggested an inquiry of his fellow workman, standing by his side, and if he did not know which way the skip-board would swing, it being his duty to protect himself, he should have exercised the choice of putting himself in one of the places which would have been safe no matter which way the skip-board might swing.

Counsel for defendant in error insist very strongly, irrespective of what the plaintiff himself might have said as to it being his own duty to get to a place of safety without further notice or warning than the mere signal "heads up" after the chains had been attached to the skip-board, that according to the evidence of Fate Hall, whose duty it was to give the signal to move the skip-board after he (Hall) had observed that the chains had been attached, it

was also his duty to see that when he did so the workmen attaching the chains were out of the way and to protect them, and that he usually would give the signal as soon as he saw that they were out of the way. There was somewhat similar testimony from Goins, the other employee who was engaged in loading the skip-board with the plaintiff. Assuming, but not deciding, that such testimony on the part of other witnesses could be taken to establish a cause of action despite the plaintiff's plain and unequivocal testimony to the contrary (see, in this connection, *Steele* v. *Central of Ga. Ry. Co.*, 123 *Ga.* 237, 51 S. E. 438), we do not think that the evidence of the two other employees,—Hall, whose duty it was to give the signal, and Goins, the fellow workman at the skip-board with the plaintiff,—is at all in conflict with the testimony of the plaintiff himself on this point. Hall testified that it was his duty to watch and observe when the chains were hooked up, and that it was his duty to thereupon give the signal; "I was watching when they got the chains attached, and when they got the chains attached I gave the signal." This statement that it was his duty to see that they were out of the way and to protect them could only mean that the skip-board was not to be moved while the workmen were engaged in attaching the chains, and that when he had observed that they had been attached it was his duty, without notice from the workmen, to give the signal "heads up," and that it was their duty to get to a place of safety. The testimony of these witnesses can not, by any sort of reasonable construction, be interpreted to contradict the testimony of the plaintiff himself, or to mean that the signals could not be given until the workmen had already stationed themselves at a place of safety, but only that they were not to be jeopardized by moving the skip-board while they were in the act of attaching the chains thereto. Hall himself testifying: "I was watching when they got the chains attached, and when they got the chains attached I gave the signal."

The case has given us considerable concern, especially as our judgment turns largely upon the testimony of the plaintiff himself, who appears, if ever a plaintiff did, to have been willing to concede any and every thing against his own interest, but, under his own testimony, which we do not think is contrary to that of Hall and Goins, we do not see how the verdict in plaintiff's favor can be allowed to stand.

(8) "In an action for damages based on personal injuries, where under the pleadings and the evidence there was an issue whether the injuries were permanent or temporary in character, and the judge instructed the jury relatively to the measure of damages applicable to a case where the injury was permanent, but omitted to give instructions as to the measure of damages that would be applicable if the injury were not permanent, such omission, even without proper request for charge, would be cause for reversal." *Seaboard Air-Line Ry.* v. *Brewton,* 150 *Ga.* 37 (2) (102 S. E. 439), s. c. 23 *Ga. App.* 621 (99 S. E. 226). In the instant case the entire instruction of the court on the subject of the measure of damages was as follows: "I charge you that if the plaintiff is entitled to recover in this case, that this would be the rule: if under the rules I have given you in charge you believe the plaintiff has made a case wherein he ought to recover, the amount he would recover would be for whatever injury and damage the jury thinks he has sustained; it is for the jury to determine whether or not the injuries are permanent in character, and, if permanent, the number of years the plaintiff might be expected to live, and the amount of his annual earning capacity, then the amount his annual earning capacity has been decreased, if decreased at all, by reason of the injury complained of, and in this way you would find the gross amount he has been damaged, if damaged at all. You should not find this gross amount, but should reduce it to its present cash value, that is, ascertain what amount paid in cash would be a just and equivalent amount of this gross amount. You should take into consideration all the facts and circumstances that might tend to show his earnings, the increase with the advance of years and experience, and any fact or circumstance that might show a decrease in his earning capacity with the advance of years, and sickness and any other circumstance that might naturally come or change that might naturally come." There was a conflict in the pleadings and the evidence as to the permanency of the injury. The pleadings of the defendant denied that the injuries were permanent, and the evidence of one of the doctors for the defendant who examined the injured ankle was that a recent X-ray did not disclose any evidence of the alleged ankylosis as claimed by the doctor for the plaintiff, and that he was willing to say that "it is almost a perfectly good angle except for the position the

ankle is held in" which he conceded was not good. The other physician for the defendant, who saw the ankle soon after the injury, testified that he saw no evidence of a permanent injury, and warned the plaintiff that if it was put into a plaster cast, as he was apprised by the plaintiff his private physician had advised, it would cause stiffness, and he would not be responsible for the consequences. The evidence, therefore, is sharply in conflict as to the permanency of the injury, and certainly as to the extent of any permanent injury, and as to the cause of any permanent injury, the evidence for the defendant indicating that the injury to the ankle was practically healed, whereas the plaintiff contended otherwise. Consequently, the rule in *Seabord Air-Line Ry. Co.* v. *Brewton,* supra, has application, since the court failed to give a complete measure of damages; and just as in *A., B. & A. Railroad Co.* v. *Barnwell,* 138 *Ga.* 569 (5), 570 (75 S. E. 645), and *Southern Ry. Co.* v. *O'Bryan,* 112 *Ga.* 127 (37 S. E. 161), where it was held that where several elements of damages were claimed, it was error, even in the absence of a request, for the judge to omit to give in charge to the jury any rule for estimating the damages claimed, so, in the instant case, where several elements of damages were claimed, and there was a dispute relative to the nature and extent of the injury and as to the cause of any permanent injury, it was error for the judge to limit and confine his instruction to the one element of damages relating to permanent injuries.

Since there is to be another trial and the other assignments of error relate to matters not likely to arise on that trial, it is not necessary to deal with them here.

*Judgment reversed. Stephens and Bell, JJ., concur.*